We'll now turn to our second case on the docket, 22-1445, Chiles v. Salazar. Counsel? Thank you, Your Honor, and good morning. I'm Cody Barnett, and I represent Plaintiff Appellant Kaylee Chiles. Would you move your mic a little closer to your mouth? Certainly, is that better? Yes. I'm going to try and reserve three minutes of my time for rebuttal. May it please the Court. Kaylee Chiles became a counselor because she wanted to help people facing serious and urgent problems. And there's an explosively growing population of detransitioners who need her help. Yet Colorado law forbids it. Ms. Chiles must either turn away these clients or risk losing her license altogether. And that's true even though Ms. Chiles' counseling is entirely speech. This is blatant viewpoint-based speech suppression. Yet the District Court refused to enjoin the law because it thought that Colorado regulated only conduct, not speech. That was wrong. First, under Holder and Niflo, Colorado's law targets Ms. Chiles' speech, not her conduct. Second, Colorado has no compelling interest in suppressing voluntary counseling conversations, and its law is not narrow-tabled. Well, that would be decided on remand if we said that reasonable, rational relation is not the standard. Isn't that right? There was no hearing regarding whether intermediate scrutiny or compelling state interest was established. Isn't that right? Correct, Your Honor. And I think you get to the crux of this case. It's what does Colorado's law target? Because if it targets speech, then straight scrutiny applies. And the Supreme Court said in Holder that the way we can tell— My point was you said we'd have to hold this, but we would have to remand if we agree, at least in part with you, that rational basis is not the standard. Isn't that right? I think, Your Honor, you can decide it in the first instance here because we're up here on a preliminary injunction. So it's baked into whether or not my client is likely to succeed on the merits. Because if Colorado's law targets her speech, then the burden shifts to the state to show that it has a compelling interest and its law is narrow-tabled. And I think this court can decide that in the first instance. In bringing up the standard that we are bound by, we're also reviewing facts for clear error, right? That's correct, Your Honor. Okay. So in order to accept your position, do we have to conclude that the district court's decision that talk therapy is essentially mental health treatment is a clearly erroneous factual finding? No, Your Honor. That's a legal conclusion. And I think that's exactly what Holder determines is that when you determine what a statute targets, that's not a factual issue but a legal conclusion. Okay. So let's assume we'll spot you that. So to accept your position, would we have to conclude as a matter of law that talk therapy is not mental health treatment? No, Your Honor. You would not at all. Mental health treatment is just a label. It doesn't actually talk to whether or not mental health treatment is speech or conduct. In fact, the district court even said that all my client does is use words and talk. It just categorized that as conduct, not speech. So this court wouldn't have to hold that mental health treatment in every circumstance is speech or conduct. But when it uses only words, it is speech. And that's what Holder in the middle of this trial. Holder says that when a law targets the mere fact of communicating a message, it's targeting speech, not conduct. That's all Colorado's law does here. When my client meets with people who come to her for help, all she does is talk to them and listen to them. There's no conduct involved. It's the state's burden to show, going all the way back to Cohen v. California, that there's some separately identified conduct that this law targets. And the state simply hasn't done so. It's used labels like treatment. But treatment doesn't say whether or not what my client does is ontologically speech. What do we do with the decision in NIFLA, which cites the joint opinion in Casey to say that the law regulated speech only as part of the practice of medicine, subject to reasonable licensing and regulation by the state? Isn't that precisely what's happening here? Not at all, Your Honor. In Casey, the law targeted what a physician was doing, a concrete medical procedure in abortion. And it said that in order to perform that abortion, the physician had to obtain informed consent. And as part of obtaining informed consent, the physician had to ask certain questions. That is a law that regulates conduct that sweeps in speech. There was a concrete medical procedure that the law targeted there. But that's not what is at issue here. There is nothing concrete. There is no medical procedure that this law is targeting. So conversion therapy is not a treatment, not a medical procedure? I think you're understanding medical procedure to actually be something that involves a scalpel, right? Or only? That's not necessarily true, Your Honor. Medical treatment can involve conduct or speech. But as far as what my client does, there is only speech involved. That's the only thing Colorado would be suppressing if it regulated what my client does. And can you crystallize again why that's true, why it's only speech? As the district court even said, Your Honor, there's nothing that my client does as part of her counseling that is conduct. She only uses words to communicate with her clients. They come in— Well, you mentioned the word messages. And I wonder what part of her—what part of her, when she sees a patient, what part of it is messages and what part of it is treatment in the sense that the statute says it's fine for her to talk to her patients about how she— conversion therapy, to discuss what treatment might look like, to refer them for treatment to a person or to a place. That's protected. That's a message. When she gets around to actually providing the therapy, that's the treatment. That's the part that's protected that the state has the interest in. Your Honor, I don't think the word treatment by itself does anything in terms of the First Amendment. Well, are you saying there's no distinction between those categories that the statute accepts and the actual therapy because she's a licensed therapist? If I'm understanding Your Honor's question correctly, the law applies whether—any attempt a counselor does to encourage change, that can be through words or it could be through conduct. And so the First Amendment is only concerned with which of those two avenues is the counselor using. It's in the complaint. And as the district court cited, all that my client uses is words. And so that is speech and needs to be treated as such for purposes of the First Amendment. In fact, I think, Your Honor, you're making a good point about the narrow tailoring problem. There were several amendments that were raised when this bill was pending that would have limited the law to only physical practices. But the legislator rejected those amendments. And so I think that goes to show that this law targets not just things that a counselor does but what she is saying. And because it targets what she is saying, it should be treated as any other speech. And that's in fact what NIFLA held, that professionals have speech rights just like anyone else. And the same test that we use to determine whether or not this law is targeting speech applies equally in the professional context. And so this law that Colorado is enacting targets my client's speech. And because it targets her speech, Your Honor, the state must satisfy strict scrutiny. And it cannot do so here. It has neither a compelling interest nor, as we just discussed, is the law narrowly tailored. Do you agree we consider the professional context as the first step in the inquiry? No, Your Honor. I do not. I think actually NIFLA says that you do not do that. It says that in determining whether or not a law targets speech or not, it's the same whether it's in the professional context or not. Well, certainly NIFLA says that just because it's in the professional context doesn't mean we should assume something greater about protections. But it certainly seems that context is relevant to the inquiry. I'm not sure how we analyze this without regard to the professional context. I think context only comes into play in the strict scrutiny part of the analysis. It does not say anything about whether this is speech or conduct. Again, all my client does is talk and listen. That is speech whether or not it happens in the counseling room or it happens in the courtroom or it happens on the street or with a neighbor. It doesn't ontologically change just because it happens in the confines of counseling. So I don't think the first step in this analysis is the professional context. It's what is being targeted. That's how I read NIFLA. There's a sentence. I took that to mean whether you call these people professional or not has nothing to do with the First Amendment analysis. Is that your understanding also? Absolutely, Your Honor. I think NIFLA reaffirms that all the rules about the First Amendment apply in the professional context. And it doesn't really matter that she is a licensed counselor. If she is speaking, she is speaking. And those same two categories that you raised, Your Honor, NIFLA, don't apply here equally because this is not a commercial context. Nor is this a law that regulates speech or lets conduct only speak in speech, incidentally. And so going to the strict scrutiny part of this analysis, Your Honors, the state does not have a compelling interest here. In fact, if you take all the evidence the state has put on display, it's alleged interest in preventing harm to minors. There is no evidence in the record at all, not a single piece, that the type of counseling that my client wants to provide leads to any harm in minors. In fact, I'd like to quote from you the state's centerpiece evidence, the APA task force report cited at page 2, footnote 2 of the state's brief. On page 42 of that report, the APA concludes, there is a dearth of scientifically sound research on the safety of this counselor. And then a few lines later, thus, we cannot conclude how likely it is that harm will occur in this type of counseling. But this gets back to our initial question. I'm not sure we have to address that if we determine that rational basis is not the standard of review. The district court just said it satisfies rational basis, made no factual determinations. There's nothing to review for clear error or any sort of error with respect to the volume or persuasiveness of the evidence provided by the state. Am I wrong about that? Well, Your Honor, I think that because we are here on preliminary injunction, because the inquiry is whether my client is likely to see the merits of her challenge, and strict scrutiny is part of that, I think it's sort of baked into the cake. And we're not saying that there is an evidentiary challenge here. In fact, this is the state's own evidence. I submit that you can take the state's evidence. You didn't present any evidence, right? Your client didn't present any evidence in connection with your PI. The only evidence is in the verified complaint. There are documented instances in the complaint that talk about the harm of the countervailing counseling, but also the benefits of the counseling that my client wants to provide. You didn't put on any expert testimony, for example, to analyze the studies that the state put forth. Isn't that correct? Correct, Your Honor. We have not gotten to that point yet. But again, for the purposes of— And if the standard were not rational basis, that would necessarily be part of the district court proceedings, would it not? I think that is true, Your Honor, but I think this court can take the state's evidence here and easily see that they do not need strict scrutiny, that all of the evidence that they had put on, which is their burden to do at this stage, to show that we are not likely to succeed on the merits, all of it— Okay, but even if we did that, that would be just to overturn the preliminary injunction, would keep the state from putting on evidence that might be more in your persuasive. Correct, Your Honor. It is not our position that the state would be foreclosed from putting on evidence as the case progresses. It's just that at this stage, my client is chilling her speech and is unable to provide critical help to people that need it, and this court should give her a preliminary injunction to remedy that issue. I see that my time is running low. I'd like to reserve the remainder for rebuttal, if I may. Thank you, Your Honors. Ms. Norton. Good morning, Your Honors, and may it please the Court. My name is Helen Norton for the State of Colorado, representing the athletes. As a brief explainance, and as I hope to discuss later, the plaintiff has not established a name. But for now, I'd like to start with three short points on the merits relevant to the discussion we've already heard this morning. First, all who choose, like Ms. Chattels, to practice as health professionals are engaged in knowledge-based disciplines and in fiduciary relationships, where they are required, among other things, to provide treatment consistent with the standard of care as established by expert consensus within their discipline. Second. Is consensus science? Forgive me? Is consensus science? Science. I can agree, but if they're all wrong, don't you need evidence besides just an opinion stated by an organization, even the State Disciplinary Board? Thank you, Your Honor. Yeah, go ahead. Stemming on page 99 of the supplemental appendix, we have Dr. Glassgold's expert declaration, which painstakingly surveys the available scientific evidence and its conclusions that conversion therapy is unsafe and ineffective because it leads to increased depression, increased anxiety, increased suicide. How many of those studies—I think this is a point made by opposing counsel—how many of those studies involve simple talk as the therapy directed at adolescents or young people? Is there any study that gives you the data on that situation? Yes, Your Honor. Where? In the supplemental appendix, starting at page 17. Why not? I want the specific study that says that, because if I'm looking at the articles, none of them confine themselves to that group, that situation. With respect, Your Honor, the American Psychological Association Task Force report, which is included in the supplemental appendix, reviewed all of the available evidence, which included both aversive therapy and also non-aversive therapy, which included group therapy. And their review concluded that no modality— That's what I'm saying. They need data, do they not? And none of the studies' data is confined to that group or distinguishes that group. Isn't that correct? Because I don't see one. You can point to one, but don't—which of these studies is directed specifically and has data with respect to speech therapy for young folks? Well, again, Your Honor, I hope I'm not misunderstanding you, but the American Psychological Association Task Force looked at everything that was available. I think maybe, Judge Hartz, if I'm understanding you, is getting at, are there studies that disaggregate aversive techniques and talk therapy? Oh, compare them to each other? And for age. I know of no—thank you. I know of no such studies. And as Dr. Glaskill's report makes clear, and I also direct you to the American Psychological Association amicus brief, which, among other things, goes in detail with their explanation of how the plaintiff has mischaracterized the available evidence. It would be unethical to engage in those sorts of studies because it would require patients to undergo a treatment that has been determined to be unsafe and ineffective. So the quote that my colleague gave about the dearth of available evidence, as the American Psychological Association and Dr. Glaskill make clear, that dearth is precisely because it would be unethical for an institutional review board to approve a study that required patients to undergo this treatment. But even—most of these studies are surveys. The big ones they rely on were surveys. Is that correct? Many of them are reviewing patients' experience, yes. Okay. So those studies could address only speech therapy to young people, could they not? I definitely see your point about you're not going to have a controlled trial, as you might with drugs, to compare people who take the drug with those who don't. I can see your point there. But even—but that's not the sort of data you have even with aversive therapy. It's primarily surveys of people who have been exposed to this type of conversion therapy and their experience, whether they are more likely to have suicidal thoughts and things like that. But none of those studies is limited to or separates out some analysis of just those who had speech therapy in their youth. Am I wrong about that? Because I'm not aware of any. Well, I'm not a scientist, Your Honor, but those who reviewed the available evidence were scientists. And again, I commend to your attention both the studies in the record and the American Psychological Association amicus. What findings did the district court make based on that evidence that you submitted? Are we bound to review for clear error? The district court found that the record amply demonstrated the expert consensus that conversion therapy is unsafe and ineffective. Wait, I thought the judge only ruled on rational basis, so that statement was not relevant to the district court's ruling. Didn't the court just say this satisfies rational basis and that's all that's necessary? Well, I think in explaining why she concluded that it easily satisfied rational basis, she was, among other things, relying on the fact that the expert consensus was that the treatment that is prohibited by this law is unsafe and ineffective. Your Honor, if I may, as the Supreme Court has recognized, the First Amendment permits states reasonable regulation of professional conduct even when that conduct involves speech, as it so often does. Colorado's law does exactly that by prohibiting this treatment that is found to be unsafe and ineffective. The First Amendment does not relieve healthcare professionals from providing treatment consistent with the standard of care, even when that treatment involves the spoken word, as it so often does. That's not the test in NIFLA. NIFLA, the second type of professional, well, the second type of professional speech that it has permitted regulation of, let me get the language here. States may regulate professional conduct even though that conduct incidentally involves speech. And you're interpreting that to mean speech can be conduct. And that's not what the court is saying. Aside, there's some circumstances in which speech, let me get the language of the court. There's some, when speech is legally efficacious, for example, when you put a price sticker on an item or you sign a deed, then your speech is legally efficacious. Outside of that, can you give any example in which the Supreme Court has interpreted speech, as construed speech, as conduct? As opposed to saying that even though a regulation on conduct can affect speech. Yes, Your Honor. Okay, give an example. Well, three examples. In Auralic, the court upheld a state ban on lawyers' in-person solicitation, pure speech, to protect clients prophylactically from unprofessional, professional conduct when they're being solicited in hospital rooms and other coercive settings. Second. That was commercial speech, the Supreme Court said. In that case, that was commercial speech. And it also described it as professional misconduct because it was engaged in violence. So it was in the context of commercial speech, trying to solicit customers, essentially. And the Supreme Court noted that the state has a special interest in protecting clients and patients from professional misconduct. Well, NIFLA says, NIFLA says something a little different. Maybe you should respond to this. May I give an example? Go ahead, go ahead. Yes, yes. Go ahead and give your examples while I'm looking for them. I appreciate your questions. You're getting at the crux of the matter. NIFLA reiterated Casey in saying that the First Amendment permits the government to reasonably regulate the practice of health care, and I would assume the practice of law. And as an example of that sort of reasonable regulation, the NIFLA court mentioned malpractice liability. Malpractice liability is often established by what a professional says or doesn't say. A lawyer, for example, commits malpractice when they fail to ask a client a question that determines the date of an accident that would start the statute of limitations running. A lawyer commits malpractice when they tell their client, don't worry about responding quickly, when that means they miss the statute of limitations. A couple of other examples I hope can also help clarify the many ways that… Let me read you the sentence that I'd like you to be thinking about when you respond here. This is from NIFLA. This court has stressed the danger of content-based regulations in the fields of medicine and public health where information can save lives. You're familiar with that sentence, I'm sure. Yes, sir. Isn't that an important consideration also? There they're talking about content-based regulation, which is what we have here. Don't you agree this is a content-based regulation? I disagree, Your Honor. Really? This is the regulation of professional conduct, which is different. And can I share with you a couple of examples? Sure. You're getting at exactly the crux of the free speech question, which I very much appreciate. Consider the many ways in which professionals engage in professional conduct for First Amendment purposes, even when that involves the spoken and written word. For example, Colorado authorizes telemedicine as part of the practice of medicine. Everything that happens in a telemedicine session is delivered through the spoken word. The provider asks the client questions. The provider communicates a diagnosis. The provider communicates a treatment plan and its costs and benefits. Yet everything that happens in that session is treatment. It's health care treatment. It's professional conduct and is subject to the duty of care and states consistent with the First Amendment may regulate it to protect clients from professional misconduct. I'm not sure that addresses my question about whether the statute we're reviewing today is a content-based regulation. It says you can do therapy as long as you're not trying to talk somebody into changing your gender identification or gender preference. And that would—isn't that clearly—it may be okay. That's something you're arguing. But isn't that content-based regulation? No, Your Honor. Colorado's law prohibits—and I'm reading from the statute—Colorado's law prohibits any practice or treatment that attempts or proposes to change. Yeah. So if you're saying something to discourage someone or to encourage someone to change gender preference or gender identification, it's prohibited. If you're affirming the patient's gender identification or gender preference, then it's prohibited. Why is that not content-based? It prohibits any treatment, regardless of the modality that that treatment takes. That treatment could be physical. That treatment could be animal therapy. It could be play therapy. It could be art therapy. It could be counseling. It is treatment, and that's professional conduct for these purposes. When it's a knowledge-based intervention— So if it's treatment, it's not content-based? Conduct is not content-based. Content-based assumes that the law prohibits speech. It prohibits treatment or practice. Another example, Your Honor, I hope that is helpful, is the practice of law. What I'm doing here today, what my colleague is doing here today, we're engaged in the practice of law. We're representing our clients, and everything that we do today, the First Amendment permits the states to regulate, to protect our clients from substandard representation. Even though everything we do, pretty much, in the practice of law is delivered through the spoken or written word. What makes this different, and when you think about why clients go to healthcare professionals, rather than to book club members or sophomore psychology majors to identify the parallels that the plaintiff herself drew in her briefing to you, why do clients go to healthcare professionals? They want to go to folks who are experts, who are knowledge-based experts, who are practicing in an evidence-based field to help them improve their health and well-being in a fiduciary relationship where they know that they are doing the best they can. Where does the Supreme Court's decision involving providing legal assistance to terrorist organizations and helping them, I'm not sure of the name of the case right now. Thank you. And the Supreme Court said that's subject to strict scrutiny, and found that it was satisfied in that case. But it started the analysis on the basis that this was content-based regulation. How do you distinguish conversion therapy from that? Thank you, Your Honor. I'd like to explain why Holder does not apply here. The statute that issued Holder did not involve the regulation of professional conduct. The statute that issued Holder prohibited anybody, regardless of their professional status, from providing support to terrorist organizations. So it was as applied. Why does that matter? Because the regulated entities in that case, even though they were lawyers, they were not engaged in an attorney-client relationship with those organizations. There was no evidence that they were or they sought to. They were akin basically to a lawyer who provides a continuing legal education presentation. They were offering their expert knowledge, but they were not doing so in the context of a fiduciary relationship where they were bound by the standard of care. I see that my time is up. I'm happy to take any additional questions. I have one more question. I wanted to know what the state's response is to my question to the appellant about how we are to think about the context here. I mean, certainly NIFLA tells us that speech is not unprotected merely because it is uttered by professionals. So in my view, that can easily be reconciled with still acknowledging that there is the regulation of the practice of medicine or the practice of psychology here. I'd like to get your take on how we account for context in applying NIFLA in this case. Thank you, Your Honor. NIFLA gives a good example of professional speech that is not professional conduct. As you know, our position here is that the law regulates professional conduct that's unsafe and ineffective. One of the statutes that issue in NIFLA required health care professionals to engage in speech disclosing the availability of services available elsewhere provided by the state. That was a professional speaking and a professional speaking to their client, but not in the context of treating their client because it was not about their own services to that client. They were being required to speak about services that could be found elsewhere. I'd like to make four quick points in rebuttal, Your Honors. I think the first is Judge Hart's. You were exactly correct that under NIFLA, what Colorado's law targets is pure speech. The state was unable just now to point to anything separate from my client's words that its law would suppress. Instead, the state continues to double down on this point that if it labels something in treatment, that makes it conduct and not speech. But it doesn't change the ontological truth that all my client does is use words when engaging with her clients. Second, I think you're entirely correct, Your Honor, that this is a content-based restriction on speech. It is triggered by what my client talks about. If she tries to engage in counseling on other topics, this law does not apply. But if she engages in counseling clients who struggle with gender identity or who struggle with sexuality or behaviors thereof, then the law applies. And because it's content-based, NIFLA says that we apply the usual free speech rules. And in fact, to Your Honor's question about context, that's the exact thing that NIFLA was rejecting. In the pickup case of the Ninth Circuit, which NIFLA cites three times and says it's not good law and not how courts should treat speech, the Ninth Circuit in pickup said that speech exists on a continuum. And that in that continuum – Well, did the Ninth Circuit think that pickup was abrogated? I don't think so. Your Honor, the Ninth Circuit was wrong when it said that pickup was not abrogated because certainly the point of – the middle point of the pickup spectrum, if you will, was explicitly abrogated. But I think the entire logic behind pickup, that you could treat professional speech differently because of its context, that was the animating force behind the Ninth Circuit constructing the spectrum. And that's the exact thing that NIFLA rejected. It reoriented the courts back to the traditional line between conduct and speech in the professional setting, which is to look at exactly what the law targets and not where the speech occurs. Your Honor, I think you are also correct that the state has provided no data on this exact type of counseling. The state referred again to the ADA report. Again, we rely on that report to show that there is no evidence here that the counseling that my client liked to engage in causes any harm. That report concluded there is no studies that have been done that examine voluntary counseling. There have been no studies that have been done that disaggregate aversive conduct techniques from pure speech techniques. Finally, Your Honor, to your point about whether that should be a question addressed on remand. Every day that this case continues and Colorado gives to chill Ms. Childs' speech is a day that she experiences harm. And so this court should not extend that harm by remanding without analyzing a strict screening out for the purposes of the preliminary injunction. We ask that you reverse the district court and instruct it to enter the preliminary injunction here. If there are no further questions. Thank you, counsel. Thank you, Your Honors. This is an important and challenging case, and counsel were exceptionally good today. I feel I learned from everybody. I know you think I've already taken a position on stuff. I'm just asking questions at this point. So, thank you. Case is submitted and counsel are excused.